## FIN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| Prysm, Inc.,[1] | Case No. 20- (  ) |
| Debtor. | |

## DECLARATION OF AMIT JAIN IN SUPPORT OF THE
## DEBTOR'S PETITION AND FIRST DAY MOTIONS

**Amit Jain,** pursuant to 28 U.S.C. §1746, declares as follows:

1.      I am the Chief Executive Officer of Prysm, Inc., a corporation organized under the laws of Delaware (the "Debtor").  On August 5, 2020, the Debtor filed its voluntary petition (the "Petition") for relief under chapter 11 of title 11 of the United States Bankruptcy Code (the "Bankruptcy Code").  The Debtor operates its business and manages its properties as Debtor-in-Possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

2.      This Declaration is being submitted in support of the Petition and the relief requested in the First Day Motions.  Except as otherwise indicated herein, all facts set forth in this Declaration are based upon my personal information, my discussions with the members of the Debtor's management, information supplied to me by the Debtor's attorneys and my review of relevant documents and information concerning the Debtor's businesses and financial affairs.  The statements contained herein are true and correct to the best of my knowledge, information and belief.

---

[1] The last four digits of the Debtor's federal tax identification number are 4348. The Debtor's service address for the purpose of this chapter 11 case is: 513 Fairview Way, Milpitas, CA 95035.

3.      I am authorized to submit this Declaration on behalf of the Debtor.  If called upon to testify, I could and would testify competently to the facts set forth herein.

4.      Part I of this Declaration sets forth certain background information regarding the Debtor and the reasons for the chapter 11 filing.

5.      Part II of this Declaration describes the "first day" motions (each such motion, a "First Day Motion" and, collectively, the "First Day Motions")[2] through which the Debtor seeks certain forms of relief necessary for its smooth transition to chapter 11.  I have reviewed the relief sought in each First Day Motion and believe the relief requested in each is necessary to enable the Debtor to continue to operate in chapter 11 and to permit the Debtor to successfully implement its chapter 11 strategy and maintain the value of its business.  Accordingly, I believe the relief sought in the First Day Motions is in the best interests of creditors, the Debtor, and the Debtor's bankruptcy estates.

## PART I:
### NATURE OF THE DEBTOR'S BUSINESS AND CIRCUMSTANCES LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASE

**Nature Of The Debtor's Business Operations.**

6.      The Debtor was formed in 2005 to develop, market and sell large-format displays using its proprietary Laser Phosphor Display or LPD technology.  The Debtor introduced its first generation of tile-based LPD displays in 2010 and its second generation of single panel large-format displays in 2018.  In 2014, the Debtor acquired the collaboration

---

[2] Unless otherwise defined herein, capitalized terms shall have the meanings ascribed to them in the relevant First Day Motion.

software business of Anacore, Inc. and began development of a collaboration software solution for large-format displays. From 2014 to 2018, the Debtor further developed the collaboration software and launched a cloud-based collaboration solution known as the Prysm Application Suite.



7.      Since 2018, the Debtor has further developed and commercialized large-format displays known as the LPD 6K Series and the Prysm Application Suite. The LPD 6K displays and the PAS collaboration service are sold together as a complete solution and separately as individual offerings. Together the LPD 6K and PAS solution enable individuals and teams to see and interact with all their data, content and applications on displays of all sizes. Customers using the LPD 6K Series benefit from interactive large-format single panel displays that offer a panoramic image uninterrupted by seams or bezels. Customers using the Prysm Application Suite software benefit from an open, enterprise-grade collaboration solution that integrates with existing tools and scales to hundreds or thousands of users.

8.      The Debtor is headquartered in Milpitas, California where it conducts product development, testing, service, support, management and administrative operations. The Debtor has a manufacturing facility in Concord, Massachusetts where it develops, tests and manufactures front panels for its LPD 6K displays for the worldwide market. The Debtor has a wholly-owned subsidiary based in Bangalore, India, and this subsidiary provides research

and development, sales and support services to the Debtor. The Debtor also has a wholly-owned subsidiary based in Dubai, UAE, and this subsidiary provides sales and support services to the Debtor.

**Prepetition Indebtedness And Capital Structure.**

9.      The Debtor is a Delaware privately held corporation with two classes of stock authorized and outstanding, Common Stock and Preferred Stock. The Preferred Stock is divided into seven series of Preferred Stock from Series AA Preferred Stock to Series EE-1 Preferred Stock. Each series of Preferred Stock has certain rights and preferences as set forth in the Amended and Restated Certificate of Incorporation of the Debtor. A summary of the Capital Structure of the Debtor as of July 20, 2020 is set out below.

Prysm, Inc.
SUMMARY CAPITALIZATION

| Stock | Shares Outstanding | % Owned Outstanding as Converted | Shares Outstanding Fully Diluted | % Owned Fully Diluted Basis |
|---|---|---|---|---|
| COMMON STOCK | 44,153,773 | 38.16% | 44,153,773 | 27.04% |
| PREFERRED STOCK | - | | - | |
| SERIES AA PREFERRED STOCK | 9,115,816 | 7.88% | 9,115,816 | 5.58% |
| SERIES BB PREFERRED STOCK | 5,019,100 | 4.34% | 5,019,100 | 3.07% |
| SERIES CC PREFERRED STOCK | 3,465,054 | 2.99% | 3,465,054 | 2.12% |
| SERIES CC-1 PREFERRED STOCK | - | 0.00% | - | 0.00% |
| SERIES DD PREFERRED STOCK | 34,952,065 | 30.20% | 34,952,065 | 21.40% |
| SERIES EE PREFERRED STOCK | 19,012,799 | 16.43% | 19,012,799 | 11.64% |
| SERIES EE-1 PREFERRED STOCK | | | | |
| | | | | |
| **Total Stock :** | **115,718,607** | **100.00%** | **115,718,607** | **70.86%** |
| RIGHTS TO ACQUIRE STOCK: | | | | |
| Stock Plans | | | | |
| Options Outstanding | - | | 13,962,568 | 8.55% |
| Options Available | - | | 8,249,512 | 5.05% |
| Plan Total : | - | | 22,212,080 | 13.60% |
| WARRANTS TO PURCHASE: | | | | |
| COMMON STOCK | | | 2,470,129 | 1.51% |
| SERIES DD PREFERRED STOCK | | | 9,207,322 | 5.64% |
| SERIES EE-1 PREFERRED STOCK | | | 13,693,309 | 8.39% |
| | | | | |
| Total Rights: | | | 47,582,840 | 29.14% |
| **Total Diluted Shares:** | | | **163,301,447** | **100.00%** |

10. Since its formation in 2005, the Debtor has invested in research and development, marketing, sales, service and support with the objective of making LPD displays a leader in the global market for large-format displays. To date, the Debtor has not achieved profitability on a GAAP or cashflow basis. The Debtor has relied on outside funding in the form of equity investment and debt financing to continue operations and continue its efforts to build a profitable business. Since December 2015, the Debtor has financed its operations through the issuance of Senior Secured Promissory Notes. Senior Secured Promissory Notes issued by the Debtor and outstanding as of June 30, 2020 are listed below.

| Noteholder | Principal Amount | Accrued Interest | Total Principal and Interest |
|---|---|---|---|
| GII Prysm Investments | 3,000,000.00 | 81,484.84 | 3,081,484.84 |
| Other Secured Noteholders | $178,391,617 | $84,308,243 | $262,699,860 |
| **TOTAL** | **$181,391,617** | **$84,389,728** | **$265,781,345** |

11. These Secured Notes are secured by a first lien on all assets of the Debtor including bank accounts, accounts receivable, inventory, equipment, intellectual property and all other assets of the Debtor, including all products and proceeds of these assets. Secured Notes issued to GII Prysm Investments are senior in right of repayment to all other Secured Notes issued by the Company.

12. As of the Petition Date, the Debtor estimates that it may possess federal net operating loss carryforwards in excess of $300 million; provided that these net operating loss carryforwards are subject to numerous limitations and restrictions  that may limit or even eliminate their availability.[3]

---

[3] Nothing herein shall be construed as or constitute a representation or warranty by the Debtor as to the amount or availability of any tax attribute, including without limitation net operating losses, or the extent to which any such tax attribute may be impacted by consummation of the Plan.

**Events Leading To Debtor's Chapter 11 Filing.**

13.    Since 2017, the Debtor has been actively seeking investments to continue operations and fund the expansion of its research and development, sales and marketing, customer support and customer success efforts.  When the company's internal efforts did not yield any serious investment offers, the Debtor engaged a global investment banking firm to lead a dual track process.  This investment bank was engaged in July 2017 to simultaneously pursue both potential investors and potential acquirors for the company.  After conducting an extensive search in 2017 and early 2018, this firm conducted a second search marketing the display business and the collaboration business as separate investment or acquisition opportunities.  In December 2017, the Debtor engaged a second investment bank to conduct a more focused and directed search for potential investors and acquirors in the Greater China region.  Search efforts continued throughout 2018 and 2019.  Many prospects in China, the United States and Europe engaged in exploratory discussions and some prospects even proceeded to negotiate terms of a possible investment.  However, these discussions did not result in any credible offers to invest in or acquire the Debtor, either in its current form or as a stand-alone hardware or software business.

14.    During this search process, the Debtor was able to continue operations using funds raised through the issuance of additional Secured Promissory Notes in June 2017, March 2018, October 2018 and December 2019.  However, these funds were not sufficient to maintain or grow the business as planned, and the Debtor was forced to significantly reduce its headcount and operations in June 2017, January 2018 and again in February 2019.  During this period, the Debtor permanently closed offices in Ghent, Belgium, London, England, Carmel, Indiana, New York, New York and Chicago, Illinois.  These reductions in headcount, office closures and reductions in development, sales and marketing resources were done to

conserve funds and better align operations with available budgets. However, these cost cutting efforts also resulted in a significant reduction in product development, sales and business momentum.

15. During the search for potential investors and potential acquirors, the Debtor did engage in advanced discussions with potential strategic partners about transactions that would involve a combination of joint development, manufacturing partnerships and strategic investments. While these discussions were serious and promising, they did not lead to any binding commitments for new investment. Ultimately, after three years of searching for acquirers and/or additional investors, the only credible offer received by the Debtor is that of ESW Capital LLC ("ESW"). ESW submitted a letter of intent on May 20, 2020 to acquire the Debtor and reorganize around its software business, while contributing the Debtor's hardware business and certain related assets into a newly formed entity for the benefit of the Debtor's lenders. The Debtor determined in its business judgment to proceed with a transaction with ESW, subject to agreement on definitive terms. The Debtor then negotiated with ESW and the majority of its secured noteholders, at arms-length and represented by separate counsel, the terms of a comprehensive restructuring (the "Restructuring") and entered into the Restructuring Support Agreement (the "RSA").

16. The Restructuring will be implemented pursuant to the Debtor's Prepackaged Plan of Reorganization (the "Plan"). Generally, the Plan is a prenegotiated and prepackaged business arrangement that provides for (1) the funding of the Cash Consideration by the Plan Sponsor in the amount of $12,000,000 plus the unfunded portion of the DIP Financing (as defined below), (2) the payment in full of the secured claim of GII Prysm Investments ("GII"), the Debtor's first priority secured creditor (unless GII elects to instead receive a pro rata portion of the equity in Hardware NewCo as described below), (3) contribution of the Debtor's Hardware Assets and

certain cash to a newly formed "Hardware NewCo" entity and distribution of the equity in Hardware NewCo to the Debtor's other secured noteholders (and to GII if GII elects such treatment instead of a cash payment of its senior secured claim) and (4) the reorganization of the Debtor by retiring, cancelling, extinguishing and/or discharging the Debtor's prepetition Equity Interests and issuing New Equity in the Reorganized Debtor to ESW, in its capacity as the Plan Sponsor or an affiliate and, to the extent that it exercises the Subscription Option (as defined below), to ESW, in its capacity as the DIP Lender.

17.     Under the terms contemplated by the RSA, the Debtor's Secured Lenders have agreed to forego material consideration for the benefit of the Debtor's unsecured creditors. Among other things, the Prepetition Lenders have agreed to forego $500,000 from the plan consideration, which amount shall be used to fund general unsecured creditor recoveries.

18.     The RSA contemplates the DIP Lender funding up to $3,000,000 of post-petition financing, inclusive of up to $750,000 on an interim basis, to cover the ordinary course operating and administrative expenses associated with preserving the Debtor's operations and running a chapter 11 process through a plan effective date.  Upon the Effective Date of the Plan, and barring a default under the DIP Note, to the extent any amount of outstanding DIP Lender obligations remain after the DIP Lender exercises the Subscription Option, the remainder of the DIP obligations shall, at the option of the DIP Lender, either be repaid in cash funded and paid by the Plan Sponsor on the Effective Date, separately and in addition to the Cash Consideration being paid under the Plan on the Effective Date, or reduced on a dollar-for-dollar basis by agreement between the DIP Lender and the Plan Sponsor. For the avoidance of doubt, in no event will the exercise of the Subscription Option, either in whole or in part, reduce the amount of the Cash Consideration paid by the Plan Sponsor.

19.     The proposed Restructuring set forth in the RSA and the Plan represents a

significant achievement for the Debtor.  Specifically, the Restructuring provides a means for the Debtor to reorganize on terms acceptable to the holders of the vast majority of the Debtor's prepetition secured debt.  The Restructuring described in the Plan is expected to give both the Debtor's hardware display business, as well as its software business, the opportunity to continue operations and build additional value over time.  In addition, absent the secured noteholders' agreement to permit all general unsecured creditors to share in a $500,000 recovery, the amounts recovered by such creditors would be substantially less.  In fact, absent the agreement of the Debtor, the Consenting Lenders (as defined in the RSA) and ESW, it is likely that the Debtor would have had no choice but to liquidate, in which case unsecured creditors would likely receive no recovery whatsoever.

**Pre-petition Solicitation.**

20.    Prior to the Petition Date, consistent with the prepackaged natured of the Plan, the Debtor commenced solicitation with respect to the Plan from the two impaired class of creditors entitled to vote on the Plan – GII, as the holder of the Class 1 Claim, and the Secured Noteholders, as the holders of the Class 2 Claims.  As of the Petition Date, the Debtor has received signed RSAs and Ballots accepting the Plan from GII (thereby satisfying the majority of claims and two-thirds of amount of claims in Class 1) and regarding Class 2 Secured Noteholders, 100% of ballots received as of the Petition Date have voted to accept the Plan  (thereby satisfying more than a majority in number and two-thirds in amount of Class 2 claims).[4]

21.    I believe that commencement of the chapter 11 case to implement the Restructuring was necessary and in the best interests of creditors and that the proposed Plan,

---

[4] As of the Petition Date, the Debtor has received six non-insider Class 2 Ballots, including but not limited to, the accepting ballot of Kuwait Investment Authority, which creditor is the holder of 92% of the amount of claims in Class 2.

including the sale of the Debtor and its software business to ESW Capital, and the transfer of the Debtor's display business into a new company wholly-owned by the holders of the Secured Promissory Notes, is in the best interests of the Debtor and its creditors.

## PART II
## FACTS IN SUPPORT OF FIRST DAY MOTIONS

22.     The Debtor is in the process of filing its First Day Motions.  The Debtor requests that each of the First Day Motions described below be granted, as each constitutes a critical element in achieving a successful transition to chapter 11.

23.     For a more detailed description of these motions, the Debtor respectfully refers the Court to the respective First Day Motions.  To the extent that this Declaration and the provisions of any of the First Day Motions are inconsistent, the terms of the First Day Motions shall control.

**A. Motion of Debtor for Entry of Interim and Final Orders Pursuant to U.S.C. §§ 105, 361, 362, 363(C), 364(C)(1), 364(C)(2), 364(D)(1), 364(E) and 507 (I) Authorizing Debtor to (A) Obtain Post-Petition Secured Financing From ESW Capital, LLC; (B) Utilize Cash Collateral and (C) Pay Certain Related Fees and Charges; (II) Granting Adequate Protection to the Prepetition Lenders; (III) Modifying the Automatic Stay; (IV) Scheduling a Final Hearing and (V) Granting Certain Related Relief ("DIP Motion")**

24.     Central to the ability of the Debtor to continue to run its business and preserve the value of its assets for all stakeholders during the pendency of this chapter 11 case is the Debtor's DIP Motion, seeking entry of interim and final orders pursuant to section 105, 361, 362, 363(c), 364(c)(1), 364(c)(2), 364(d)(1), and 507 of the Bankruptcy Code (a) authorizing the Debtor to obtain post-petition financing, continue use of cash collateral and pay certain fees and charges related to the DIP Financing and granting liens and superpriority claims with respect to such post-petition financing; (b) granting adequate protection to the prepetition lenders; (c) modifying the automatic stay to the extent necessary to effectuate the terms and conditions of the DIP Orders; (d) scheduling a final hearing and (e) granting related relief..

25.     By the DIP Motion, the Debtor seeks approval of the $3.0 million debtor-in-possession financing facility (the "DIP Financing"), including up to $750,000 on an interim basis. The terms of the DIP Financing are reasonable under the circumstances and were the product of good faith, arm's length negotiations.  The Debtor has an immediate postpetition need to use Cash Collateral and access the liquidity provided by the DIP Financing. The Debtor cannot maintain the value of its estate during the pendency of the Case without access to cash. The Debtor will use the cash, among other things, to fund the operation of its business and to fund the administration of the Case. Substantially all of the Debtor's available cash constitutes the Cash Collateral of the Prepetition Lenders. The Debtor will therefore be unable to operate its business or otherwise fund the Case without access to Cash Collateral, and will suffer immediate and irreparable harm to the detriment of all creditors and other parties in interest

26.     The Debtor has not been able to obtain an alternative financing commitment on terms better than those proposed by the DIP Lender. While the DIP Financing contemplates a priming of the Prepetition Lenders' security interests other than to the extent of the GII Secured Claim, the Prepetition Lenders (other than GII to the extent of the GII Secured Claim) have consented to the priming in the context of the global resolution of this Chapter 11 Case, as reflected in the RSA. Importantly, if the Debtor were to obtain an alternative source of financing other than the DIP Financing, ESW would be entitled to terminate the RSA to the detriment of estate stakeholders.

27.     Specifically, the DIP Financing provides for:

    a. a multiple-draw term loan credit facility of up to a maximum of $3.0 million (the "Stated Principal Amount"), including up to $750,000 on an interim basis, secured by a first priority on any and all pre- and post-petition property of the Debtor and/or its estate, whether existing on the Petition Date or thereafter acquired; subject to the senior claims of the Secured Notes previously issued to GII Prysm Investments; and

    b. borrowings and disbursements to be made, and proceeds to be used, pursuant

to the terms of the Budget, provided, however, that under no circumstance shall such borrowings and disbursements be for an amount in excess of the Stated Principal Amount.

28.     On the Effective Date, the DIP Lender shall have the option, on account of being the holder of the DIP Lender Claim, to exchange a total of up to 100% in satisfaction of such amount of its allowed claim for up to a total of 600 shares out of the total 1,000 shares of the issued equity of the reorganized debtor, at a rate of 10% of the Allowed DIP Lender Claim for 60 shares of New Equity of the equity of the reorganized debtor (the "Subscription Option"). Further, as described above, the DIP Lender, on account of being the holder of the allowed DIP Lender Claim, shall receive, payment in cash of the remaining amount of the allowed DIP Lender Claim after the DIP Lender has exercised the Subscription Option to receive its share of the equity of the reorganized debtor; provided that the plan sponsor and the DIP Lender, to the extent they are both the same entity, may agree to satisfy the allowed DIP Lender Claim without having to fund actual Cash from the Plan Sponsor to the DIP Lender. The DIP Lender Claim shall be repaid by a combination of the Subscription Option (which shall reduce amounts owing under the DIP Note on a dollar-for-dollar basis), the funding of additional consideration by Plan Sponsor or cancellation of such amounts advanced under the DIP Financing.

29.     The DIP Financing will provide the Debtor with sufficient liquidity to fund the Debtors' business operations and administrative expenses during the case. If approved, the Debtor will use the proceeds of the DIP Financing to, among other things, honor employee wages and benefits, procure necessary goods and services, and fund general and corporate operating needs as well as to fund the administration of the Case, in each case in accordance with a budget agreed to by the Debtor and the ESW Capital, LLC ("DIP Lender").  The Debtor and its estate would suffer immediate and irreparable harm if the Debtor was denied the financing needed to sustain on-going business operations during the critical first weeks of this case. The DIP Financing ensures that the

Debtor (a) has sufficient funding to consummate the Plan contemplated by the Restructuring

Support Agreement and (b) can continue to operate uninterrupted in the case.

30.     The Debtor has recently made efforts to find alternative financing from traditional

and other sources and was not able to find terms better than those provided in the proposed DIP

facility.  As such, I believe the relief requested in the DIP Motion through the DIP Lender will

maximize the value of the Debtor's estate for the Debtor's stakeholders and is an exercise of the

Debtor's sound business judgment.

**B. Motion of Debtor For Entry of Interim and Final Orders (I) Authorizing Payment of Certain Amounts Due to Employees, (II) Confirming Right to Continue Employee Programs on a Post-Petition Basis, (III) Authorizing Payment of Withholding and Payroll-Related Taxes, and (IV) Granting Such Other Further Relief ("Wage Motion").**

31.     The Debtor employs 61 Employees (as defined in the Wage Motion).  The

continued and uninterrupted service of the Employees is essential to the Debtor's

reorganization.  To minimize the personal hardship the Employees will suffer if prepetition

employee-related obligations are not paid when due, and to maintain the Employees' morale

during this critical time, the Debtor, by this Motion, seeks authority to (i) pay certain pre-

petition amounts owing to Employees up to the statutory cap of $13,650 per employee;[5] (ii)

confirm the Debtor's right, but not its obligation, to continue to maintain and offer certain

Employee Benefits to Employees; (iii) authorize the Debtor to pay any and all payroll-related

or similar taxes relating to pre-petition periods to the extent due and not already paid; and

---

[5] The Debtor does not anticipate that the payment made to any Employee in connection with prepetition wages, salary, and other compensation will exceed the sum of $13,650 allowable as a priority claim under section 507(a)(4) and (5) of the Bankruptcy Code. To the extent any such claim exceeds the statutory cap, the compensation paid to any Employee will be limited to the $13,650 authorized by the Bankruptcy Code.

(iv) grant such other and further relief as the Court deems necessary and proper (collectively, the "Employee Obligations").

**Summary of Prepetition Employee Obligations.**

**(a)    Wages, Salaries and Other Compensation.**

32.    The Debtor pays salaried Employees on a semi-monthly basis and hourly Employees on a bi-weekly basis. The Debtor's average weekly payroll is approximately $120,000.[6]  Paychecks are drawn on the Debtor's payroll account. As of the Petition Date, the Debtors owe Employees $165,000 on account of wages.

**(b)    Vacation, Sick, Personal and Holiday Leave.**

33.    In the ordinary course of business and as is customary with most companies, the Debtor established various employee benefit plans and policies for the benefit of its Employees that provide such persons with vacation, holidays, sick time, and similar benefits for  Employees (collectively, the "Employee Benefits").  The Debtor seeks to continue to allow Employee Benefits in the ordinary course of business.

**(c)    Payroll Taxes and Deductions.**

34.    The Debtor makes payments to cover outstanding tax obligations related to employee and employer payroll taxes. The Debtor seeks authority to pay payroll taxes associated with the Employee Obligations covered by the Wage Motion.

**Authority for Banks to Honor and/or Reissue Checks.**

35.    The Debtor further request that the applicable banks be authorized to receive, process, honor and pay any and all check and transfers drawn on the Debtor's accounts

---

[6] Net of all deductions required for taxes, benefits and other employee programs.

relating to the Employee Obligations, whether such checks were presented before, or are presented after, the Petition Date.

36.     Accordingly, by the Wage Motion, the Debtor seeks (i) authorization for, and/or ratification of, its bank's honoring of prepetition payroll checks and transfers on or after the Petition Date, (ii) authorization for the bank to process and honor all other checks issued for payments approved by the Wage Motion, and (iii) authorization to reissue checks for payments approved by the Wage Motion where the check therefore is dishonored postpetition.

37.     I believe the relief sought in the Wage Motion is necessary to retain the Employees who conduct the Debtor's business.  Without payments to the Employees, the Employees may become demoralized and unproductive because of potential significant financial strain.  I, therefore, believe that payment of the prepetition obligations with respect to the Employees is a necessary and critical element of the Debtor's effort to preserve value and will give the Debtor the greatest likelihood of retention of the Employees as the Debtor seeks to operate its business during this chapter 11 case.

C. **Debtor's Motion For An Order (I) Authorizing The Debtor To (A) Continue and Maintain Its Consolidated Cash Management System, (B) Continue And Maintain Its Existing Bank Accounts And (C) Use Existing Business Forms; (II) Waiving the Requirements of Bankruptcy Code section 345(b); and (III) Granting Related Relief ("Cash Management Motion").**

38.     As more fully set forth in the Cash Management Motion, to avoid disruption to the ordinary and usual cash management and day-to-day operations of the Debtor, and to ensure an orderly transition into chapter 11, the Debtor respectfully requests an order authorizing the Debtor to continue to use its existing bank accounts, cash management system, checks, and business forms.

39.     As of the Petition Date, the Debtor maintains seven (7) separate bank

accounts: (i) Account No. xxxxxx6525, No. xxxxxx1126, No. xxxxxx3451, No. xxxxxx4472, No. xxxxxx0359, and No. xxxxx6403 with Silicon Valley Bank (the "Silicon Valley Accounts"); and (ii) Account No: xx-xxx15DE with the San Jose office of UBS Bank (the "UBS Account" and together with the Silicon Valley Accounts the "Accounts"). The Debtor believes that the Accounts are maintained at stable financial institutions. The below chart summarizes the use of each Account.

| Bank | Account Number | Use of Account | Amount in Account |
|---|---|---|---|
| Silicon Valley Bank | xxxxxx6525 | Payroll, Opex, Bank fee | $0.00 |
| Silicon Valley Bank | xxxxxx1126 | Accounts Receivables | $0.00 |
| Silicon Valley Bank | xxxxxx3451 | Cash Sweep Account | $959,556.00 |
| Silicon Valley Bank | xxxxxx4472 | Payrolls, Rents | $75,899.00 |
| Silicon Valley Bank | xxxxxx0359 | Credit Card Collateral | $50,000.00 |
| Silicon Valley Bank | xxxxxx6403 | Checking | $114.72 |
| UBS Bank | xx-xxx15DE | Reserves | $653,439.00 |

40.     The Cash Management System maintained by the Debtor has been designed (i) to provide an efficient method of collecting, transferring and disbursing funds; (ii) to establish procedures and controls necessary to account for funds in an accurate manner; and (iii) to facilitate satisfaction of the Debtor's financial obligations. The Debtor maintains current and accurate accounting records of daily cash transactions and submits that preservation of its Cash Management System will prevent undue disruption to the Debtor's business operations, while protecting the Debtor's cash for the benefit of the estate. All funds received or disbursed are properly reflected on the Debtor's books and records.

41.     Because of the disruption that would result if the Debtor were forced to close its existing bank accounts, I believe that it is critical that the existing Accounts remain in place. I believe that that relief requested in the Cash Management Motion is in the best interests of the Debtor's estate, its creditors, and all other parties in interest and will enable

16

the Debtor to continue to operate its business in chapter 11.  Accordingly, on behalf of the

Debtor, I respectfully submit that the Cash Management Motion should be approved.

**D. Debtor's Motion for Interim and Final Orders (I) Prohibiting Utility Companies from Discontinuing, Altering, or Refusing Service, (II) Deeming Utility Companies To Have Adequate Assurance of Payment, and (III) Establishing Procedures For Resolving Requests for Additional Assurance Pursuant to 11 U.S.C. §§ 105 and 366 ("Utility Motion").**

42.    Through the Utility Motion, the Debtor seeks entry of interim and final orders

pursuant to 11 U.S.C. §§ 105(a) and 366: (i) prohibiting utility service providers from altering,

refusing or discontinuing services to, or discriminating against, the Debtor as a result of the

commencement of this case or on account of prepetition invoices, (ii) approving the Debtor's

proposed form of adequate assurance, (iii) establishing procedures for resolving adequate

assurance objections by utility providers, and (iv) scheduling a final hearing to consider the

relief requested herein on a final basis.

43.    In the operation of its facilities, the Debtor incurs utility expenses in the

ordinary course of business for, among other things, electricity, telephone service, and

internet service.   Prior to the Petition Date, on a monthly basis, the Debtor spent

approximately $30,865.00 for various utility services.  A list of the Utility Companies is

attached to the Utility Motion as Exhibit A.

44.    Uninterrupted utility services are essential to the Debtor's ongoing operations

and, therefore, to the success of the Debtor's chapter 11 efforts.  Indeed, any disruption to

the Debtor's operations by virtue of the cessation of utility services by the Utility

Companies could bring the Debtor's operations to a grinding halt. Should one or more of

the Utility Companies services be disrupted, such an interruption would damage customer

relationships, revenues, and profits and would ultimately adversely affect the Debtor's

chapter 11 efforts, to the detriment of its estate, creditors, and employees. It is therefore

critical that utility services provided to the Debtor continue uninterrupted.

45.    The Debtor submits that its proposals to deposit an amount equal to 50% of the Debtor's estimated monthly cost of utility services into a segregated account maintained by the Debtor and the Debtor's current financial condition adequately assure payment to the Utility Companies, without the need for deposits or other security.  The Debtor has, and will continue to have, sufficient funds from on-going operations to make timely payments to all Utility Companies on account of postpetition services provided.

46.    Additionally, the Debtor seeks to establish reasonable procedures by which Utility Companies may request additional adequate assurance of future payment, in the event that a Utility Company believes that additional adequate assurance is necessary. These procedures ensure that all key stakeholder groups obtain notice of such request before it is honored.

47.    Any disruption would adversely impact customer relationships and could result in a significant decline in the Debtor's revenue and profits.  Therefore, it is critical that the Utilities Companies continue to provide services uninterrupted during this chapter 11 case.  Accordingly, I respectfully submit that the Court should approve relief requested in the Utility Motion.

**E. Debtor's Motion for Interim and Final Orders (I) Authorizing, but not directing, Payment of Prepetition Property, Business, and Similar Taxes and Fees and (II) Authorizing Banks and Other Financial Institutions to Receive, Process, Honor, and Pay Checks Issued and Electronic Payment Requests Made Relating to the Foregoing (the "Tax Motion")**

48.    Under the Tax Motion, the Debtor seeks entry of interim and final orders pursuant to 11 U.S.C. §§ 507(a)(8) and 541(d) and Rules 6003 and 6004 of the Federal Rules of Bankruptcy Procedure (i) authorizing, but not directing, the Debtor to pay certain prepetition taxes, including property taxes, franchise fees, and similar taxes and fees in the ordinary course of

business, as the Debtor, in its sole discretion, deems necessary, (ii) authorizing banks and other financial institutions (the "Banks") to honor and process check and electronic transfer requests related to the foregoing, and (iii) granting related relief.

49.      In the ordinary course of business, the Debtor incurs or collects and remits certain taxes including property taxes and various other taxes, fees, charges, and assessments (the "Taxes and Fees").  The Debtor remits such Taxes and Fees to various federal, state, and local taxing and other governmental authorities and/or certain municipal or governmental subdivisions or agencies of those states (the "Taxing Authorities") in connection with the operation of its business and the sale of products.  The Taxing Authorities are set forth on Exhibit B to the Tax Motion.

50.      The Debtor seeks authority to continue remitting, in their sole discretion, Taxes and Fees in the ordinary course of business owed to the Taxing Authorities.  The Debtor also requests that all Banks on which checks to third parties are drawn and/or electronic payments are made pursuant to the Tax Motion be authorized to receive, process, honor, and pay any and all such checks (whether issued or presented before or after the Petition Date) and electronic payments, and to rely on the representations of the Debtor as to which checks are authorized to be paid.

51.      Any regulatory dispute or delinquency that impacts the Debtor's ability to conduct business in a particular jurisdiction could have a wide-ranging and adverse effect on the Debtor's operations as a whole and on the value of its estate.  Specifically, the Debtor's failure to remit the Taxes and Fees could adversely affect the Debtor's business operations because, among other things (a) the Taxing Authorities could initiate audits of the Debtor or seek to prevent the Debtor from continuing its business and administering its estate, which, even if unsuccessful, would unnecessarily divert the Debtor's attention from the process of maximizing the value of the estate; (b) the Taxing Authorities could attempt to suspend the Debtor's operations, file liens, seek to lift the automatic stay and pursue other remedies that will harm the estate; (c) some of the Taxing

Authorities may seek to collect penalties, cancel licenses, or undertake other unfavorable enforcement actions if the Debtor does not pay the Taxes and Fees; and (d) certain of the Debtor's directors, officers, and employees might be subject to personal liability, even if such a failure to remit such Taxes and Fees was not a result of malfeasance on its part, which would undoubtedly distract these key people from its duties related to the Case.

52.     Accordingly, I submit that the relief requested in the Tax Motion will enable the Debtor to continue to operate its business in chapter 11 without disruption and should be approved.

**F. Debtor's Motion for Entry of an Order (I) Establishing Deadlines for Submitting Proofs of Claim, (II) Approving the Form and Manner for Submitting Such Proofs of Claim, and (III) Approving Notice Thereof ("Bar Date Motion")**

53.     Through the Bar Date Motion, the Debtor seeks an order (i) establishing deadlines for creditors to submit proofs of claim, (ii) approving the form and manner for submitting such proofs of claim, and (iii) approving notice thereof.

54.     It is well recognized that the claims bar date plays an essential role in the dual goals of bankruptcy—i.e., preserving going concerns and maximizing property available to satisfy creditors. The claims bar date allows the debtor and parties in interest to expeditiously determine and evaluate the liabilities of the estate and develop a sound plan of reorganization.  Especially considering the proposed timeframe for the combined Confirmation Hearing (defined below) for the Debtor's Plan, it is of critical importance for the universe of claims to be known as of the Confirmation Hearing.  Prolonged uncertainty regarding claims would delay and potentially upset this process.

55.     Through the Bar Date Motion, the Debtor also seeks to establish procedures for providing notice of the Bar Dates and the proof of claim form. The proposed mailings will provide actual notice to known creditors wherever practicable, while at the same time preserving the integrity of the Bar Dates.

56.     The Debtor respectfully requests that this Court find that the Debtor's proposed procedures regarding all notices be deemed: (a) good, adequate, and sufficient notice to all creditors of the Bar Dates and their rights and obligations in connection with any Claims they may assert against the Debtors in this chapter 11 case and (b) to satisfy the requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules.

57.     I believe the relief requested in the Bar Date Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest as it will ultimately enable the Debtor to evaluate the liabilities of the company.  I respectfully submit that the Bar Date Motion should be approved.

**G. Debtor's Motion for Entry of: (I) An Order (A) Scheduling a Combined Disclosure Statement Approval and Plan Confirmation Hearing, (B) Establishing a Plan and Disclosure Statement Objection Deadline and Related Procedures, and (C) Approving the Confirmation Hearing Notice; and (II) An Order (A) Approving the Adequacy of the Disclosure Statement, (B) Approving the Solicitation Procedures and (C) Confirming the Plan ("Procedures Motion")**

58.     Through the Procedures Motion, the Debtor seeks entry of (i) an order (a) scheduling a combined hearing (the "Confirmation Hearing") on the adequacy of the Debtor's disclosure statement and confirmation of the Debtor's prepackaged chapter 11 plan, (b) establishing a deadline for objections to the adequacy of the Disclosure Statement and confirmation of the Plan  and approving related procedures, (c) approving the form and manner of notice of the Confirmation Hearing, and (d) conditionally waiving the requirement to convene a meeting of creditors under section 341(a) of title 11 of the Bankruptcy Code, as well as granting any related relief; and (ii) an order (x) approving the adequacy of the Disclosure Statement, (y) approving the solicitation procedures the Debtor used prepetition to solicit votes to accept the Plan, and (z) confirming the Plan Section  105 of the Bankruptcy  Code expressly authorizes  the Court to "issue an order . . . that . . . provides that the hearing on approval of the disclosure statement

may be combined with the hearing on confirmation of the plan" where the Court deems a combined hearing to be "appropriate to ensure that the case is handled expeditiously and economically." *See* 11 U.S.C. § 105(d)(2)(B)(vi).

59.    Consistent with the foregoing, the Debtor respectfully requests that the Court grant the Debtor's request to consolidate the approval of the Disclosure Statement and confirmation of the Plan at the single Combined Hearing and enter an order scheduling the Combined Hearing.

60.    In connection therewith, the Debtor seeks that the Court approve the following dates:

| Event | Date |
|---|---|
| Voting Record Date | July 30, 2020 |
| Solicitation Commencement Date | August 1, 2020 |
| Petition Date | August 5, 2020 |
| Notice Date | August 7, 2020 |
| Voting Deadline[7] | August 21, 2020 |
| Objection Deadline | September 4, 2020 |
| Confirmation Hearing | September 15, 2020 |

61.    Here, the Disclosure Statement contains ample information to allow well informed judgments on the Plan. Specifically, the Disclosure Statement contains detailed information with respect to, among other things: (a) the Debtor's business and prepetition capital structure; (b) the relevant events and circumstances preceding and causing the Debtor's chapter 11 case; (c) the major events during the administration of the Debtor's chapter 11 case; (d) the key terms of the Plan; (e) estimates of the anticipated distributions to be received by holders of allowed claims; (f) the feasibility of the Plan; (g) a comparison to hypothetical liquidation under chapter 7 of the Bankruptcy Code; (h) risk factors that may affect the Plan; and (i) the federal tax consequences of

---

[7] The "Voting Deadline" is the date and time by which pre-petition holders of Class 1 and Class 2 claims were provided in terms of voting to accept or reject the Plan.

the Plan.  Thus, the Debtor respectfully submits that the Disclosure Statement contains "adequate information" within the meaning of section 1125 of the Bankruptcy Code.  Accordingly, the Court should approve the Disclosure Statement at the Combined Hearing.

62.    I believe the relief requested in the Procedures Motion is in the best interest of the Debtor's estate, its creditors, and all other parties in interest.  I submit, on behalf of the Debtors, that the Procedures Motion should be approved.

**H. Motion of the Debtor for Entry of an Order (A) Authorizing the Debtor to Enter into the Restructuring Support Agreement and (B) Granting Related Relief ("RSA Motion")**

63.    By the RSA Motion, the Debtor seeks authorization to enter into the restructuring support agreement between the holders of the vast majority of the Debtor's prepetition secured debt (collectively, the "Consenting Prepetition Lenders"), ESW as Plan Sponsor and DIP Lender, and the Debtor. As described above the RSA contains the agreements regarding the Restructuring that were reached among these stakeholders following extensive arm's length negotiations.  As also described above, under the terms contemplated by the RSA, the Consenting Prepetition Lenders have agreed to forego material consideration for the benefit of the Debtor's creditors. Among other things, the Consenting Prepetition Lenders have agreed to forego $500,000 from the plan consideration, which amount shall be used to fund junior creditor recoveries.  The RSA also contains a "fiduciary out" provision which would allow the Debtor to accept an offer it determines to be superior to the Restructuring contemplated by ESW's offer, the RSA and the Plan.

64.    As such, I believe the relief requested in the RSA Motion will maximize the value of the Debtor's estate for the Debtor's stakeholders and is an exercise of the Debtor's sound business judgment.

## CONCLUSION

I hereby certify that the foregoing statements are true and correct to the best of my knowledge, information and belief, and respectfully request that all of the relief requested in the First Day Motions be granted, together with such other and further relief as is just and proper.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this 5th day of August, 2020.

Prysm, Inc., Debtor and Debtor in Possession

*Amit Jain*
Amit Jain (Aug 5, 2020 14:28 PDT)

Amit Jain
Chief Executive Officer

# First Day Declaration

Final Audit Report                                                          2020-08-05

| | |
|---|---|
| Created: | 2020-08-05 |
| By: | Asaf Kharal (AKharal@prysm.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAANanJqZlYJVnFF9gDZD9FRlhZ_PJhppDA |

## "First Day Declaration" History

🗋 Document created by Asaf Kharal (AKharal@prysm.com)
   2020-08-05 - 9:26:09 PM GMT- IP address: 24.5.206.104

🖃 Document emailed to Amit Jain (ajain@prysm.com) for signature
   2020-08-05 - 9:26:31 PM GMT

🖊 Document e-signed by Amit Jain (ajain@prysm.com)
   Signature Date: 2020-08-05 - 9:28:14 PM GMT - Time Source: server- IP address: 73.92.16.54

◉ Signed document emailed to Asaf Kharal (AKharal@prysm.com) and Amit Jain (ajain@prysm.com)
   2020-08-05 - 9:28:14 PM GMT

Adobe Sign